COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Chaney and Lorish
Argued by videoconference


BOYCE BENTON, III

v.      Record No. 2033-23-3

NELSON COUNTY DEPARTMENT
  OF SOCIAL SERVICES                         MEMORANDUM OPINION* BY
                                             JUDGE LISA M. LORISH
SAMANTHA BENTON                              OCTOBER 15, 2024

v.      Record No. 0056-24-3

NELSON COUNTY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF NELSON COUNTY
Michael R. Doucette, Judge

Rick Boyer (Integrity Law Firm, PLLC, on brief), for appellant
Boyce Benton, III.

Rebecca L. Wetzel (Wetzel Legal, PLLC, on brief), for appellant
Samantha Benton.

P. Scott De Bruin (P. Scott De Bruin, P.C., on brief), for appellee.

Bryan E. Klein (Crusader Law, PLLC, on brief), Guardian ad litem
for the minor children.


In these consolidated appeals, Samantha Benton (mother) and Boyce Benton (father)

challenge the termination of their parental rights over their four children under Code

§ 16.1-283(B) and Code § 16.1-283(C)(2).  They argue that the circuit court abused its discretion

in terminating their rights because they conformed with all services required of them by social

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

services and alleviated the issues in the home that initially led to the children's removal. They also argue that they did not have the opportunity to improve their parenting skills because social services offered them limited visitation with their children due to staffing concerns. Because the circuit court did not abuse its discretion in finding that the requirements of Code § 16.1-283(B) were met by clear and convincing evidence, we affirm the decision to terminate mother and father's parental rights.

BACKGROUND[1]

Mother and father are the biological parents of A.B. (11), J.B. (10), N.B. (9), and B.B. (8). Due to a history of methamphetamine use and domestic violence by the parents, the family had been placed on a safety plan by the Nelson County Social Services Department (the Department) that allowed the Department to make unannounced visits to the home. During one such visit on December 30, 2021, a social worker found deficiencies in the home environment, including an overwhelming odor of urine, cigarettes, and marijuana. The children's beds had no sheets on them, and there were dirty clothes strewn about their bedrooms. There was also a disposable pan in the home that N.B. explained to the social worker was the children's "litter box." The social worker further reported that the home was "crowded with belongings and messy" and that the floors were stripped to plywood because the carpet had been removed due to mold. The children's grandmother and an unhoused man also stayed in the home with the family. During the visit, mother tested positive for marijuana and father refused to take a drug test. Finding that the home environment was unsuitable for children, the Department removed the children from the home based on "physical neglect and inadequate supervision."

---

[1] The record in these cases was sealed. Nevertheless, the appeals necessitate unsealing relevant portions of the record to resolve the issues mother and father have raised. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

At the time of the children's removal from the home, the Department began offering services to mother and father, including "psychological evaluations with parental aptitude" and random drug screenings. Mother and father were also already receiving some services through Region Ten Community Service Board. The next month, in January 2022, mother and father moved to Glasgow in Rockbridge County, where they were offered services by the Rockbridge County Community Service Board, including individual counseling, group therapy, substance abuse therapy, and substance abuse counseling. Mother was referred to Mary Rice of Rice Counseling and Associates in November for individual counseling. Both parents were also referred to Dr. Chad Kellum, another private provider, for a parenting evaluation. Jewel West, the foster care worker for the children, testified that both parents cooperated with services "to the best of [her] knowledge." Mother was reluctant to engage in any therapy without father, so she did not participate in individual counseling with Rice but she did participate in family reunification therapy with father. Social workers also visited the new home in Glasgow and found that there were no issues with the home itself that would prevent the children from living there.

Due to a lack of staffing at the Department, mother and father only began supervised visitation with their children about six and a half months after the children were removed from their home. Between August and October 2022, the supervised visitation consisted of a supervised phone call between mother, father, and their sons, in addition to two visits with the children at a park. In November 2022, they received weekly supervised visitation with the children provided by Sally Barca of Rice Counseling and Associates. But visitation stopped in April 2023 after a permanency planning hearing in juvenile and domestic relations (JDR) district court, during which Barca testified that father had exhibited some delusional thinking in her previous interactions with him. Following that hearing, father said that he would no longer

participate in visitation with his children if Barca was supervising. Since the April hearing, mother and father called their social worker "approximately three times" to arrange visitation, but because of low staffing, the Department could not provide anyone else to supervise visitation with the children, so there was no visitation from then on.

Following the JDR status hearing, mother and father became discouraged and felt like they would not be able to get their children back no matter what they did. The counselor called and asked them if they wanted to continue with more assessments or counseling but they declined. The counselor also sent mother a letter regarding a scheduled intake with Advanced Psychotherapeutics, to which mother did not respond. Mother and father were also still using marijuana despite being ordered not to, but they did not test positive for any other drugs over 22 months of testing.

The Department began exploring options for a kinship foster care placement for the children. They sent out letters to all of the parents' relatives, and two expressed interest in caring for the children but were ultimately determined not to be a good fit. Mother and father did not provide the names of any relatives that they thought could care for the children.

Because no relatives could be identified, the children remained with non-relative foster families. The girls, N.B. and A.B., were placed in one foster home, and the boys, J.B. and B.B., lived in another,[2] but they met up once a month for a sibling visit. The children's counselors and the guardian ad litem described them as doing fairly well in foster care. The boys lived on a large farm with other foster siblings, while the girls lived with a single foster mother; both sets of children appeared to have "therapeutic foster parents."

---

[2] The boys were placed in the same home but with separate parents.

While in foster care, the children received counseling and their counselors testified at the termination hearing regarding their status. A.B., the eldest child, has the most severe psychological condition and has been determined to be borderline intellectually disabled. She was diagnosed with severe stress and adjustment disorder, which her counselor testified was caused in part by the neglect and trauma she experienced while living with her parents. In particular, A.B. is traumatized by sexual abuse she and her siblings suffered at the hands of a family friend of her parents.[3] She also reported to the counselor that father was physically abusive to both herself and her mother. Specifically, she reported that he would "beat" her and throw things at mother in her presence. She also claimed that father allowed her to drink beer and wine in the home and told her not to tell anyone. A.B. is the only child receiving medication, which she takes for mood stabilization and incontinence. A.B. has acted out in foster care by stealing money and engaging in hypersexual behavior. She has also acted out at home and school by having "bad tantrums" and "tear[ing] apart the classroom when she was angry."

N.B., the Benton's younger daughter, has far fewer severe psychological issues, with most of her problems centered around anxiety at school caused by perfectionism. She has been diagnosed with adjustment disorder and has expressed being sad and missing her parents. She also struggles with hypersexual behavior.

J.B. and B.B. share a counselor, who testified about their respective conditions. According to the counselor, J.B. has social anxiety and behavioral issues. The counselor found that while J.B. was generally making good progress on these issues through therapy, he would

---

[3] Evidence produced at the hearing showed that mother and father did not know that the family friend would sexually abuse the children, but they knew that the friend sold methamphetamine and that the children would "run away" from the friend and did not like to be around him. Regardless of this information, they left the children unattended in his care.

"regress" significantly around the time he had visitation with his parents. She testified that J.B.'s anxiety would increase leading up to the visits and that he would have "a lot of overwhelming emotions and behavioral outbursts." The counselor therefore concluded that the parental visits were "detrimental" to J.B.'s wellbeing, and when her agency was asked by the Community Service Board to supervise visits, they declined to do so. As to B.B., the counselor testified that he had been diagnosed with specified trauma and stressor related disorder. He displayed several negative behaviors including physical outbursts, becoming physical with authority figures, destroying his home, bedwetting, and running away from supervisors. The counselor reported that these behaviors worsened around the time of visitation with the children's parents. She said that J.B. and B.B. engaged in inappropriate touching of themselves, which she described as "masturbation movements," after visitation with their parents. She recommended termination of visitation between the boys and mother and father because of the "extreme emotional effect" on B.B. and J.B. and the "regression" she believed they experienced from the visitations. That said, the children did not express to her that they were either excited or reluctant to see their parents, either before or after visitation.

Another counselor that met with the boys testified that B.B. has post-traumatic stress disorder resulting from the "sexual, emotional, and physical abuse" he experienced while living with mother and father. J.B., she testified, also has post-traumatic stress disorder and reactive attachment disorder, which is caused by a lack of connection at a young age with his caregivers and being in the foster care system. This causes him to struggle with asking for and receiving help and building relationships with others. She also tied this to the neglect and abuse he experienced with his parents and the sexual abuse from the family friend. That counselor believed that reunification with mother and father would be detrimental to both boys.

Rice, who provided joint co-parenting counseling sessions to mother and father, also testified at the hearing. She reported that the parents appeared to be trying in therapy, but that they had significant trauma of their own that prevented them from progressing. In particular, father struggled with having been physically and sexually abused as a child. Both parents also had difficulty processing mother's prior sexual assault. Rice also reported that mother and father struggled with the order not to smoke marijuana. While they would sometimes try to refrain from smoking, they were often adamant that they would not stop smoking although it could cause them to permanently lose their children. Rice believed that the couple viewed marijuana as a "means to treat their issues." In her final interactions with mother and father, Rice did not feel that they were at a point where they could be healthy parents for their children.

Barca also saw the couple for counseling sessions. She testified that father experienced delusional or psychotic thinking, particularly when he was taking drugs, which led her to diagnose him with substance-induced psychosis and post-traumatic stress disorder with psychotic features. She recounted one interaction where she was talking to mother and father during a phone therapy session, and she had to call for a welfare check because they were drunk and became violent with one another. Barca recommended that father take the psychotropic medications that he had been prescribed to treat his psychosis, but he refused to do so and continued using marijuana instead. Father reported that he would have panic attacks when he stopped smoking marijuana. Barca also testified about mother and father's interactions with their children during supervised visitation. She said that father seemed like he was "consistently interested in the kids and kind of held back some of the more problematic behavior" during visitation. She reported that while there were times where it seemed like he was increasing the anxiety of his children, father generally made a "good effort" to follow the rules, which demonstrated to her that "he clearly loves his children." She added that the parents never did

anything sexual or inappropriate with the children during the visits. When asked how long she thought it would take for father to rehabilitate to a point where he might be able to have his kids again, she said "at a minimum a year" if he continued with counseling, as "[h]e's got a very complicated set of symptoms."

Mother and father did not put on any evidence at the hearing, but the children's guardian ad litem provided his opinion to the court. The guardian ad litem believed that termination of mother and father's parental rights was in the best interest of the children, particularly because the children have high needs that must be addressed through many counseling appointments and because they were all doing well in their foster homes.

During closing argument, counsel for the Department admitted that there is "no question" that "DSS's actions at the beginning of this case were atrocious," but that once the services and visitation were in place, mother and father failed to take full advantage of those opportunities. Mother and father each argued that they had remedied the issues that had caused the Department to remove the children from their home, completed the services that were asked of them, and that they should not be faulted for the Department's failure to provide adequate services.

The court took the case under advisement and later issued orders terminating both mother and father's parental rights over all four children, under Code § 16.1-283(B) and Code § 16.1-283(C)(2). First, the court acknowledged that the Department's early remedial efforts for mother and father were admittedly deficient. But the court also found that beginning in November 2022, the Department had "rendered or made available reasonable and appropriate social, medical, mental health or other rehabilitative measures." The court noted that in reaching its decision, it had considered "all measures provided by DSS, and [mother and father's] unwillingness or inability to remedy the conditions which led to or required continuation of the children's foster care placement, between November 1, 2022 and October 16, 2023." The court

believed that this period, during which mother and father did receive services, was "a reasonable period of time for the parents to make any substantial remediation" and that "neither parent has made any progress towards remediation of the conditions that led to or required continuation of the children's foster care placement."

Mother and father each appeal.

ANALYSIS

In termination of parental rights cases, we always begin with the presumption that "the child's best interests will be served when in the custody of its parent." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 45 (2014) (quoting *Judd v. Van Horn*, 195 Va. 988, 996 (1954)). Indeed, "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court.]" *Moore v. Joe*, 76 Va. App. 509, 518-19 (2023) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "This liberty interest of natural parents 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . [P]arents retain a vital interest in preventing the irretrievable destruction of their family life.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 700 (2022) (alterations in original) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Because the termination of parental rights is a "grave, drastic, and irreversible action," "[s]tatutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." *Id.* (quoting *Welch*, 64 Va. App. at 44, 45).

At the same time, "trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests" in child welfare cases. *Castillo v. Loudoun Cnty. Dep't of Family Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax*

*Cnty. Dep't of Human Dev.*, 13 Va. App. 123, 128 (1991)). In reviewing a decision to terminate parental rights, this Court presumes that the lower court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005) (quoting *Farley v. Farley*, 9 Va. App. 326, 329 (1990)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" *Id.* (quoting *Logan*, 13 Va. App. at 128).

Because "the rights of parents may not be lightly severed," *M.G. v. Albemarle Cnty. Dep't of Soc. Servs.*, 41 Va. App. 170, 187 (2003) (quoting *Ward v. Faw*, 219 Va. 1120, 1124 (1979)), the statutory grounds for termination must be fulfilled by clear and convincing evidence, *Fields*, 46 Va. App. at 7. Ultimately, the "child's best interests" remain the "paramount consideration" of the appellate court. *Akers v. Fauquier Cnty. Dep't of Soc. Servs.*, 44 Va. App. 247, 262 (2004) (quoting *Logan*, 13 Va. App. at 128). "Even on this issue, however, we cannot 'substitute our judgment' for the circuit court's, but rather review the record only to determine if sufficient evidence supports it." *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 266-67 (2005) (quoting *Ward v. Commonwealth*, 13 Va. App. 144, 148 (1991)). In doing so, "[w]e view the evidence in the 'light most favorable' to the prevailing party in the circuit court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'" *Id.* at 262 (quoting *Logan*, 13 Va. App. at 128).

Mother and father contend that the circuit court abused its discretion in terminating their parental rights under Code § 16.1-283(B).[4] Under that statute, the parental rights of the parent of

---

[4] While mother's counsel conceded at oral argument that she had not specifically addressed the termination of parental rights under Code § 16.1-283(B) on brief, given the due process concerns at stake, we exercise our discretion to consider her arguments to the extent that they apply to Code § 16.1-283(B).

a child found by a court to be neglected or abused and placed in foster care can be terminated if the court finds, based on clear and convincing evidence, that 1) "it is in the best interests of the child"; 2) "[t]he neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development"; and 3) "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time." The statute "'speaks prospectively,' as to the parent or parents' ability to remedy the conditions that led to a child's placement in foster care." *D. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 342, 369 (2012) (quoting *Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 562 (2003)). Even so, "Virginia's jurisprudence recognizes that 'past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 425 (2012) (quoting *Winfield v. Urquhart*, 25 Va. App. 688, 695-96 (1997)).

I. The neglect or abuse suffered by the children presented a serious and substantial threat to their lives, health, or development.

The Department removed mother and father's children from their care based on "physical neglect and inadequate supervision," as well as the unsuitability of their home environment for children. During a visit to the home on December 30, 2021, a social worker found deficiencies in the home environment, including an overwhelming odor of urine, cigarettes, and marijuana. The home was "crowded with belongings and messy" and the floors were stripped to plywood because the carpet had been removed due to mold. There was also evidence that mother and father were having the children use a "litter box." During the visit, mother tested positive for marijuana and father refused to take a drug test. After the children were removed from the home, their subsequent therapy sessions revealed allegations of physical abuse by father.

When viewed in the light most favorable to the Department, there was clear and convincing evidence presented that "[t]he neglect or abuse suffered by [the children] presented a serious and substantial threat to [their] li[ves], health or development." Code § 16.1-283(B)(1). The "plain language" of this statute "mandates that the trial court not only find that the child was abused or neglected, but also that the child was abused or neglected to a heightened degree, i.e., to such an extent that there is a serious threat to his life, health, or development." *C. Farrell*, 59 Va. App. at 404. This requirement is met here, as the counselors testified extensively about the children's emotional and developmental issues during the termination hearing.

The eldest child, A.B., has been diagnosed with severe stress and adjustment disorder, which her counselor testified was caused at least in part by the neglect and trauma she had experienced while living with her parents. Her counselor found that she has been traumatized by "severe neglect," sexual abuse she suffered at the hands of a family friend, and by witnessing and enduring physical abuse by father. Her condition caused her to act out at home and school by having "bad tantrums" and "tear[ing] apart the classroom when she was angry." She also exhibits hypersexual behavior.

N.B. has been diagnosed with adjustment disorder and anxiety. Her counselor had to work with her on "emotional regulation with frustration" and decreasing her anxiety symptoms. Like her sister, she also displays hypersexual behavior.

J.B. has been diagnosed with social anxiety, post-traumatic stress disorder, and reactive attachment disorder, which his counselor believed to be caused by the neglect and abuse he experienced with his parents and the sexual abuse by the family friend. While his counselor reported that he was generally making good progress on these issues in therapy, he would "regress" significantly around the time he had visitation with his parents. She testified that his anxiety would increase leading up to the visits and that he would have "a lot of overwhelming

emotions and behavioral outbursts," leading the counselor to conclude that the parental visits were "detrimental" to J.B.'s wellbeing.

Finally, B.B. has been diagnosed with post-traumatic stress disorder resulting from the "sexual, emotional, and physical abuse" he experienced while living with mother and father. He displays several negative behaviors including physical outbursts, becoming physical with authority figures, destroying his home, bedwetting, and running away from supervisors. The counselor reported that these behaviors worsened around the time of visitation with the children's parents. She believed that reunification with mother and father would be detrimental to both boys.

This evidence demonstrates that the neglect or abuse the children suffered while living with their parents resulted in a serious and substantial threat to their life, health, or development. Each of the children has received a clinical mental health diagnosis that their counselors have tied to their treatment while living with mother and father. Furthermore, two of the children's counselors testified that their behavioral issues worsened around the time they had visitation with mother and father and that they believed it would harm the children to reunify with their parents. Given this testimony, we cannot say that the circuit court abused its discretion in finding that the children's health and development were threatened by the abuse and neglect they suffered while under the care of mother and father.

II. It is not reasonably likely that the conditions that resulted in such neglect or abuse can be substantially corrected or eliminated to allow the children's safe return to mother and father within a reasonable period of time.

The next requirement of Code § 16.1-283(B) is that "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time." Mother and father argue that the Department failed to satisfy this requirement because they

complied with all services required of them by the Department and remedied the issues in the home that initially led to the children's removal. They emphasize that the reasons cited by the Department in removing the children were "physical neglect and inadequate supervision" and that much of the evidence the Department relies on in support of the termination of their parental rights does not relate to the initial impetus for removal. They also point out that the removal was largely caused by the unsatisfactory conditions in their former home in Nelson County, but they have since moved to a new home in Rockbridge County, with which the Department did not find any issues.

Mother and father's efforts to better their living situation for their children are commendable, but the statute required the circuit court to consider more than just the presence of an adequate housing option. Instead, the court needed to determine whether the underlying conditions that led mother and father to neglect and inadequately supervise their children in the prior residence had been substantially corrected or would be substantially corrected within a reasonable period of time. In making this determination, the statute instructs the court to consider "the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care." Code § 16.1-283(B)(2). The statute also provides three circumstances that constitute prima facie evidence of the conditions set forth in subsection (B)(2):

> a. The parent or parents have a mental or emotional illness or intellectual disability of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development;
>
> b. The parent or parents have habitually abused or are addicted to intoxicating liquors, narcotics or other dangerous drugs to the extent that proper parental ability has been seriously impaired and the parent, without good cause, has not responded to or followed through with recommended and available treatment which could have improved the capacity for adequate parental functioning; or

c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child.

When viewed in the light most favorable to the Department, the evidence presented at the circuit court hearing supports a finding by clear and convincing evidence that mother's and father's conduct meets the criteria of Code § 16.1-283(B)(2)(a). At the time of the hearing, each parent had emotional difficulties stemming from past trauma—mother's prior sexual assault and father's sexual and physical abuse as a child. Counselors testified that each parent had difficulty processing these issues and that they had not made much progress in therapy despite attending several sessions. This trauma had led the couple to use methamphetamine, although they were only using marijuana by the time they were in counseling. One of the counselors testified that father suffered from "substance-induced psychosis and post-traumatic stress disorder with psychotic features," and both counselors reported that mother depended on father and showed a reluctance to engage in services by herself. Mother was asked to go to individual counseling to work though her past trauma, but she declined. Neither counselor believed that mother and father could work through these issues within a period of time that would allow them to adequately care for their children. The guardian ad litem also expressed concern that if the children were returned to mother and father, they would not be able to meet the children's significant needs resulting from their mental health diagnoses, including getting them to therapy appointments. This testimony, when viewed in the light most favorable to the Department, established by clear and convincing evidence that mother and father's deficiencies were severe enough that there was no reasonable expectation that they could undertake the responsibility of providing the care their children needed under Code § 16.1-283(B)(2)(a).

There was also clear and convincing evidence that father met the criteria of Code § 16.1-283(B)(2)(b). Testimony at the circuit court hearing showed that while father had refrained from consuming methamphetamine during the time he was receiving routine drug tests from the Department, he continued to defy orders that prohibited marijuana use. Barca believed that father's use of marijuana seriously impaired his parental ability. She testified that father experienced delusional or psychotic thinking, particularly when he was taking drugs, which led her to diagnose him with substance-induced psychosis and post-traumatic stress disorder with psychotic features. She also testified that although the marijuana inhibited father from progressing in processing his trauma, he viewed it as a form of treatment. Father established no good cause for failing to follow through with recommended and available treatment that could have improved his parental capacity. His counselor and psychiatrist repeatedly told him to stop smoking marijuana and to take the psychotropic medication that was prescribed to him, but he declined. There was therefore clear and convincing evidence that father's drug use severely impaired his parenting abilities and that he failed to take advantage of treatment without good cause.[5]

Mother and father's other primary contention on appeal is that they were offered insufficient services by the Department. Evidence presented at the hearing showed that despite mother and father's efforts to seek supervised visitation with their children, the Department failed to provide them with visitation for the first six and a half months that the children were in foster care due to staffing issues. Thereafter, mother and father had only three in-person visits and one phone call with their children from the date of the removal on December 30, 2021, until November 2022. Starting in November 2022, they received weekly supervised visitation with

---

[5] While mother also used marijuana, there was little evidence presented regarding its impact on her parenting abilities, so we do not find that her marijuana use was sufficient for a prima facie finding under Code § 16.1-283(B)(2)(b).

the children.  But following the JDR hearing in April 2023, at which father took issue with the testimony of the counselor who had been supervising the visits, mother and father refused to continue visits with the same supervisor and there was no other available staff.  The Department also did not refer mother and father to any parental counseling until November 2022—eleven months after they were separated from their children.  During the hearing, counsel for the Department acknowledged that the Department's provision of services in this case was "atrocious."

But we have held that the provision of services is not a requirement under Code § 16.1-283(B).  "Code § 16.1-283(B) requires only that the circuit court consider whether rehabilitation services, if any, have been provided to a parent.  Nothing in Code § 16.1-283 or the larger statutory scheme requires that such services be provided in all cases as a prerequisite to termination under subsection B."  *Toms*, 46 Va. App. at 268; *see also* Kate D. O'Leary, *Termination of Parental Rights in Virginia*, 17 J. Civ. Litig. 17 (2005) (Code § 16.1-283(B) does not "mandate that a public or private agency provide any services to a parent after the child enters foster care.").[6]  Accordingly, while it is regrettable that the Department admittedly failed

---

[6] In considering whether Code § 16.1-283(B)(2) was satisfied, however, a court must take into consideration "the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care."  Code § 16.1-283(B)(2).  Here, the record contains very little information about what services mother and father were receiving prior to the children's initial placement in foster care.  The record only shows that they were receiving unspecified services from Region Ten and that they were under a safety plan with the Department.

to provide an ideal level of services in this case, that alone is not a reason to find that the circuit court abused its discretion with respect to Code § 16.1-283(B).[7]

III. The termination of parental rights was in the best interests of the children.

Finally, Code § 16.1-283(B) only permits the termination of parental rights when it is in the "best interests of the child." There was significant evidence here that termination of mother and father's parental rights was in the best interest of each child. Each child had a counselor who testified to their psychological and developmental conditions and further linked the development of those issues to mother and father's care. The children's guardian ad litem also believed that the children were better off in foster care than living with their parents. The guardian ad litem expressed the specific concern that the children have high needs and mother and father would not be able to reliably take them to their necessary appointments. Lastly, mother and father's counselors testified that it was unlikely that they could sufficiently progress within a reasonable period of time such that they could resume custody of their children. This Court has recognized that "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Joyce*, 75 Va. App. at 706 n.3 (alterations in original) (quoting *Tackett v. Arlington Cnty. Dep't of Human Servs.*, 62 Va. App. 296, 322 (2013)). Therefore, we cannot find that the circuit court abused its discretion in finding that it was in the best interest of the children to terminate mother and father's parental rights.

---

[7] Even if we were to consider the Department's initial failure to provide appropriate services, the circuit court made a factual finding that between November 1, 2022 and October 16, 2023, mother and father did receive services and that this was "a reasonable period of time for the parents to make any substantial remediation." Despite this, "neither parent [had] made any progress towards remediation of the conditions that led to or required continuation of the children's foster care placement." Because this factual finding is not plainly wrong, we defer to it under our standard of review.

- 18 -

CONCLUSION

For all these reasons, we find no error in the circuit court's rulings and therefore affirm.[8]

*Affirmed.*

---

[8] In terminating mother and father's parental rights, the circuit court also found that the requirements of Code § 16.1-283(C)(2) were met by clear and convincing evidence. Because we find no abuse of discretion in the circuit court's termination of mother and father's parental rights under Code § 16.1-283(B)(2), we do not reach the issue of whether the court abused its discretion in terminating under (C)(2). *See Winslow*, 40 Va. App. at 563 (noting that in termination of parental rights cases, alternative findings for termination in subsections (B) and (C)(2) provide distinct, "individual bases upon which a petitioner may seek to terminate residual parental rights"); *see also Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) ("We have an 'obligation to decide cases on the best and narrowest grounds available.'" (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022))).